Case number 21-7047. Noah J. Rosenkrantz et al. Appellants versus Inter-American Development Bank. Mr. Wren for the appellants. Mr. Green for the appellate. Morning, counsel. Mr. Wren, please proceed when you're ready. Thank you, your honors, and may it please the court. I am Greg Wren. I am counsel for the appellants plaintiff Noah Rosenkrantz, Christopher Thibodeau, and T-Tech Inc., and I've asked to reserve two minutes for rebuttal. In this de novo review of the district court decision below, the defendant, Inter-American Development Bank, has the burden of proving its claim to immunity under the International Organizations Immunities Act and proving that plaintiff's claims do not fall within a statutory exception. Plaintiffs have brought claims for breach of contract, breach of the duty of good faith and fair dealing, and a related business and these claims allege bad faith, arbitrary and capricious acts by bank personnel in the United States in breach of contractually required disciplinary procedures that apply to commercial contracts with U.S. suppliers. So there are two exceptions to the bank's immunity that apply in this case, a waiver under the bank's charter and the commercial activities exception under the Foreign Sovereign Immunities Act, but I'd like to preface the discussion by Amiki May, which is that the privileges and immunities of international organizations are tailored. They're tailored by the negotiations and agreements of the member states based on what they believe the organization needs in order to achieve its objectives, and then those privileges and immunities, as we can see in this case, become reflected in a charter, the charter agreement, the treaty by which the bank was formed. Then the president, under the IOIA, has been given authority by Congress to limit privileges and immunities that an organization might otherwise have in light of its functions, and this ensures that that tailoring that took place by the member states is sort of preserved when the organization then is being designated under the IOIA. And then finally, if it ever gets to a point where an organization feels like its privileges and immunities are not sufficient, not adequate, well, the Supreme Court recently made clear in the GM decision that their remedy is to ask their member states to change their charter, but not to look to the judiciary to do that, because that supplants the judiciary's judgment on really policy issues about its privileges and immunities that are really for the member states and the president to decide. So with that, let me turn to the commercial activities exception first. And here, it really is a straightforward application of the test that was, again, recently stated in the GM decision. There, the court said the commercial activity exception is broad, and the test is simply whether it is within the powers of private citizens in trade and commerce. If an activity is, then it is a commercial activity. Plaintiffs put forward several examples in the record below and here of private organizations that use similar disciplinary procedures, even in sports leagues, for example, where the sanction might not just be being barred from a team. You can have a lifetime ban from the entire league. You can be completely out of the whole league. So we put in several examples there of those sorts of things that are in the power of private citizens to do in trade and commerce. The bank entities. It seems like the relationship here between the sanctioning body and the people who are being sanctioned is a different relationship than in a private administrative disciplinary proceeding, isn't it? Sorry to interrupt. No, I'm sorry. I was asking the question. In that way. No, it's a great question. Actually, I'm not even sure if any of the examples actually directly to employee relations. There's different examples. Sometimes you see them in just supply chain management, but they're with outside contractors and vendors. You can see them in professional associations. I think we had like the AICPA accounting association where it's a private membership. Now, Kumar was a case that we did cite. I guess that was an employee situation. It was a professor at a private university. But actually, so usually the basis is contractual, but they're private agreements, private associations, but they're not even focused, I think, on employee. Those would be more. But do we really have a similar contractual relationship here? Yes. And let me explain it. So plaintiff's claims and we sort of identify and it gets a little confusing because there are a few projects and different papers, but we highlighted in our opening brief, the key sections from a contract that you had to agree to, to be able to bid on these projects that were being put out by the bank. And these are commercial supply agreements. So those are sort of prototypical commercial activity. And now there is an issue that the defendant has pointed out, or they keep saying we're not a party to the agreement, the plaintiffs. Well, the plaintiffs are claiming rights as ascertainable third-party beneficiaries under district of Columbia law to assert the protections that are available for individuals under those procedures that were breached as part of this. They're not parties to the contracts. I mean, that just, that seems like that is a difference between a sovereign function and a private function because you would imagine in a private situation, private parties who are parties to the contract would be subject to the sanctions procedures, but a mark of a sovereign exercising its prerogative is that with its sanctions procedures, it can extend beyond parties, but it can extend to others. That's their argument, your honor. But actually, when you look at it, they are exercising, certainly not a sovereign power because they're not a sovereign. And even the Thornburg report and what they rely points out, the bank has no governmental power. The charter at article 11, section two says it's a juridical entity. So they're not doing anything that private parties can't do by contract. And we sort of illustrate that in our reply brief. One of the sanctions, for example, can be a monetary sanction. The respondent can be required to reimburse investigation costs and things like that. Well, you simply have to ask, how would the any other private party, they only have two options. And one is to sue on a contract in court. The other is to decide they're never going to work with that company again, or its personnel. That's a boycott. So they really have no power over third parties. They don't even have subpoena power under the Thornburg report, as it points out. They are doing nothing that a private party and private parties do. They're doing nothing that private parties can't do. They have no special power, no sovereign power, for sure, to do anything beyond that. And I'll just point out, if I may, the entire context is these commercial supply agreements. These procedures only apply to outside external parties. They only apply to these sort of commercial arrangements in these projects. They, by their terms, apply only to people who are either a direct party to a contract or have a nexus. And that nexus, as you look at it, is exactly what we base, because what makes the plaintiffs ascertainable third-party beneficiaries who have a right to come in and enforce things in their benefit under the contract, even though they're not a direct party, direct privity, they have that right. And so that's the point. And even, for example, if you look at the Kumar case as just the types of things that violated good faith and fair dealing and so on, they're very similar here. So I see my time has run out, unless there's other questions. Did you want to address the waiver basis at all? Yes, I'd be happy to do that now. So this court has consistently construed Article 11, Section 3 of the bank's charter as a waiver agreement. And the parties don't disagree. It's a waiver, and the parties don't disagree about that. The parties disagree is which of this court's precedents construing that waiver apply to this case. Now, and the plaintiffs win under either test, anything that is applied. But we've also argued that the proper application here is the first decision by this court in the Lutcher case. That also involved external parties, external contract-related claims, implied claims under contract. The defendant argues that subsequent decisions in Mondaro and Atkinson, which involved internal civil servant claims, should apply. And that imposed a test that was not found in Lutcher, the corresponding benefit test. Why are they wrong about that? Usually, we do apply more recent standards. So aren't they correct that we're really supposed to be looking at Mondaro in this circumstance? Respectfully, no. And I'll explain. I think there's a couple reasons. One, of course, is it's distinguishable on the facts. They claim it's stare decisis. Those cases dealt with internal civil servant claims. Also, under the law of the circuit doctrine, Lutcher, if there's a conflict, and there is, if you try to apply Mondaro to external parties, the tests are different. And I'll just point out in Mondaro, unlike the Lutcher decision, Mondaro and Atkinson did not discuss at all the legislative history of the bank, of the United States joining the bank. They did not discuss at all the deference that was due to President Kennedy's executive order that limited and required a strict construction of that waiver. All right. So if we disagree with you, Mr. Wren, if we think Mondaro applies, do you lose? I mean, you're struggling very hard to not have us look at that test. And I'm wondering whether that means that if we apply it, you think it doesn't come out your way? No, that's a totally fair question. I think this is an opportunity for the court to kind of look at the jurisprudence, address it, but no. And here's the reason why. As the bank points out in their brief, the parties that have succeeded, where the waiver has been construed to apply, is based on this hesitancy. Would these parties, would third parties of this sort be hesitant to do business with the bank if the bank was not susceptible to judicial process? So it's a hesitancy argument. And it's sort of well-established that, well, that hesitancy is met with private commercial suppliers. If you're not going to get paid on the contract, if you can't sue to enforce it, well, the bank wouldn't be able to do business with third-party suppliers. Right. But that's not the situation, right? We're not talking about a claim by these people that they haven't been paid under either a regular contract or a quasi-contract sort of circumstance. This is about the application of sanctioned procedures. And so what is the argument that unless they're allowed to sue for enforcing those kinds of procedures, they would not want to do business with the bank? Yes. Fair question. So here's the issue. If the concern about collecting on a contract, because this is contractual and the claims being brought and that will be addressed on the merits are contractual. If bringing a claim just to hesitant such that the bank needs to, the court infers that a waiver is implied, we've pointed out what happens in a sanctions procedure and what happened to the plaintiffs here has been called the corporate death penalty. So how much more hesitant would someone be when what you have at risk is not just collecting money on your contract, but that you and the people that work with can be barred, but your career can be ruined and your company can be ruined. And so let me ask you about this. You sort of boiled it all down the Mondaro test to the hesitancy, but what about the negative or harmful effect on the bank itself if it is subject to all of these suits? I thought that was part of the test as well. It's not just the hesitancy, the fact that people may not want to contract anymore. It is, if we allow these sorts of suits, what harm will befall the institution. And it seems to me that there's a real concern that having these kinds of lawsuits brought from all these different jurisdictions with various circumstances would be a problem if this was allowed. Well, so fair enough. Here's why I don't believe it is. First of all, if you look at the history of Sarin and the Villa cases, for example, when it's been external parties, there has not been that concern and there's never been a showing that there's going to be this wave of debilitating lawsuits or things like that. That was a concern in Mondaro, which involved employee related claims and those could be scattered over jurisdictions. In these contracts, there's several things that not that risk. First of all, we pointed out the data in the brief. The most recent data was 30 active investigations a year. And so one can presume not all of them are going to be complaining. Secondly, for it to be a problem to interfere at all with what the bank's doing, somebody has to get a preliminary injunction, which is what we attempted here, but we couldn't get past the immunity issue in the court below. And that is an extremely high standard. And we've also shown that these... You're saying that having to respond to litigation, having to respond to a preliminary injunction is not a cost to the bank? It's a cost, but that kind of cost was not enough to outweigh the concerns in Sarin and Villa, for example. Nobody wants to be sued, but this is an issue about whether these parties in commercial relationships can have their claims heard. The bad faith conduct that took place here, to have the opportunity to bring contract claims, which by the contracts that the bank consistently uses, do not scatter claims around. They require venue and choice of law in... I understood that there is at least a dispute about whether or not these claims actually qualify as contract claims. So if we disagree with you, that the sanction procedure provisions are actually in the contracts. Do you lose them? Well, no. Actually, first, one, if you actually just apply the Supreme Court's test to what is commercial activity, the sanctions procedures, even if they're standing alone, still fall in that. They're all about commercial activity and they're all about supply chain management. They're all about relationships with outside vendors. That being said, we did show in our opening brief, we don't actually have to rely on the procedures per se. There is an explicit set of provisions in the first RFP that were put out without the qualifications. It just says, with this shall be... It's a summary of the whole procedures. And that was accepted in writing by plaintiff Rosencrantz, who was the CEO. And so there is a direct contract there that is sort of separate from the procedures. And we also showed, for example, and these are facts that should be construed in the plaintiff's favor as well. We showed that the bank uses the contracts to... There was evidence that shows in their own reports that when they did not have these contractual, what they call them the integrity provisions, when they were not in a themselves, they rely on the contracts to... Because again, they have no subpoena power. So the only way they can investigate, the only way they can get witnesses and documents is they have relied on the contract claims that give them the right to do that sort of stuff. Let me make sure my colleagues don't have additional questions for you at this time, Mr. Wren. Not for me. Thank you. We'll give you a little bit of time for rebuttal. Thank you. Mr. Green, we'll hear from you now. Good morning. May it please the court. My name is Griffith Green for the Inter-American Development Bank. This case is a challenge to the internal procedures that the IDB uses to protect its development funds by suspending or debarring parties that have been found to have engaged in prohibited practices from being awarded IDB-funded contracts in the future. The IOIA and the Foreign Sovereign Immunities Act make the IDB immune from this type claim. The IOIA grants the bank the same immunities as foreign states. So the bank stands in the shoes of a foreign state in a challenge to that state's debarment procedures to disqualify someone from being given government contracts in the future. Similar arrangement there. Plaintiffs argue that there are two exceptions to this immunity, both a waiver by the IDB's charter and also the commercial activity exception. Let me address the waiver issue first. The issue of how the IDB's charter and when that charter waives its immunity has been dealt with by this court many times over the last 40 years. Mandaro articulated a detailed test for analyzing that that has been followed in multiple cases, including Atkinson, Osirin, Vila, and most recently JAM. But Mr. Grant says it's not applicable here. So what's your argument? He says we're supposed to be applying Letcher and not Mandaro. Well, Mandaro specifically considered Letcher in formulating its test and plaintiffs are not the first litigants to argue that Letcher and Mandaro were inconsistent. Indeed, in the JAM 1 decision, the first decision by this court before it went to the Supreme Court, this court specifically dealt with the argument that those cases were inconsistent and in its opinion found that they were not. Indeed, the concurring opinion specifically started with the observation that Mandaro provides a test for deciding this case. So that issue, whether Letcher and Mandaro are inconsistent, has already been considered and was decided in JAM 1 that they were not, that they were reconcilable, and that Mandaro simply elaborated on Letcher. And that's correct because if you apply the rule in Mandaro to the Letcher case, the plaintiffs still win. So they're not inconsistent, which means that the rules that Mr. Wren cites about going to the first in time and so on just don't apply because the cases are not irreconcilable. So Mandaro is what applies. Mandaro's rule states that the charter does not waive immunity unless such waiver would further the bank's ability to achieve its objectives. That's a little bit counterintuitive and the usual explanation is think of a contract to buy office supplies, that the bank wouldn't be able to buy office supplies on normal commercial terms if the supplier didn't know that it could get paid. And so in those circumstances, a waiver benefits the bank. There is no benefit to the bank from this type of lawsuit. You know, there is nothing about having its internal procedures reviewed by the courts of one of its member nations that furthers its objectives in protecting its funds from the market for its contracts. So I heard Mr. Wren say the benefit is that people would be more likely to engage in contracts if they knew that they could enforce these sanction procedures through the courts. Why is he wrong about that? Your Honor, in this case, it is, you know, this is not a, I don't think there's a benefit ever in that. But in this particular case, this is not a lawsuit by a party that contracted with the IDB. It's a lawsuit by employees of parties that contracted with the IDB. And indeed, one of the contracts on which they claim to be suing, neither the plaintiffs nor the IDB were parties to the contract. It was a contract with the government of Barbados. So the argument that people would be reluctant to contract with the IDB just doesn't work in this case because they're not the contracting parties. More broadly, you know, it's highly speculative. It's really seems to be pushing the edge of plausibility to argue that, you know, someone who's looking to sell goods or services in a contract to develop the third world is really going to be hesitant because of the fear that, you know, if someday down the road after the contract is performed and paid for, there might be an investigation, there might be sanctions procedures, sanctions proceedings, and the bank might not follow its internal procedures in the way that I want them to. That just doesn't seem to be the type of tangible benefit that was found in, for example, Osirin or Avila, where it was found that in those cases, those type of claims, and again, it's a type analysis, not necessarily particulars, would further the bank's objectives. More important than that. Because of the likelihood that the concern would come to pass, right? I mean, it seems to me that we are, you're not, you're not saying that there could even as a matter of conceivability never be a concern. It's just that as compared with some of the situations in which waiver has been found to be in the party's interest, it's just unlikely that the set of circumstances in which that concern would come about would actually come to pass. That's right, your honor. I mean, I mean, people can be concerned about a lot of things, but that's not really a reasonable or palpable concern for parties who are looking to sell goods or services into the development market. Also, under Atkinson, you don't just look at the benefits. If there's no benefit, then it's a full stop. If there is a benefit, then the court is required to weigh the costs as well. And the costs here are very large. You know, this suit was filed expressly for the purpose of who will be eligible for sanctions, for bank-funded contracts. Mr. Wren says that it's not a worry. It's not really a process, a concern for the bank because they sought a PI and didn't get one. I would submit to you that there's, it's rather expensive for the bank to defend these suits, that the lawsuit also sought a permanent injunction and economic damages, and more importantly, involves the courts of one country of the U.S. in supervising what is a collective enterprise by 48 countries. Also, the point that it doesn't impose costs on the bank because a PI is hard to get is kind of a weird standard because it would suggest that there's jurisdiction if the plaintiffs are likely to lose, but no jurisdiction if they're likely to win because that would is engaged in previously. It is looked at the costs, both in terms of disruption to the internal processes and disruption to the collective governance principles of multilateral organizations like the bank. Do you want to speak to your, the commercial activity exception? Yes. Let me, thank you, Your Honor. The commercial activity exception is a three-part inquiry and it's, important to keep the section, the parts separate because they involve different inquiries. The first step is to decide the gravamen of the case, and this is driven principally by Sachs. In that, in that, under Sachs, the question for the court is what is the core of this case? What, what actually injured plaintiffs? What are they complaining about? Now, in this case, the complaints about the procedural aspects of the sanctions procedures have been couched in terms of contract, and that approach was specifically rejected in Sachs. In that case, the plaintiff had purchased a railway, a railway ticket in the U.S. and was later injured by a train in Salzburg, Austria. Plaintiffs argue relying on Kirkham, principally on Kirkham, that, that it was actually applied as a one element test, that if any element in any of their claims involves a then it's also the exception. Sachs specifically, Sachs abrogated the rule in Kirkham. Those cases are factually indistinguishable. Sachs was a railway ticket bought in the U.S. with a personal injury at a railway platform in Austria, in Austria. Kirkham was the purchase of an airline ticket in the U.S. and an injury at an airport in France. In fact, so they're factually indistinguishable. If Sachs, after Sachs, Kirkham has to come out the other way. Also, the Ninth Circuit opinion in Sachs specifically relied on Kirkham for its rule and then got reversed by the Supreme Court. So the plaintiffs- I guess I'm understanding you, Mr. Green, to suggest that the gravamen of this lawsuit you say is not commercial. Is that- Well, it's a two-part test, Your Honor. I'm saying that the gravamen is the bank's administration of its sanctions procedures. That's sort of- And then the analysis is, after defining gravamen, is that conduct commercial in nature? So if the gravamen is running the sanctions procedures or sanctioning parties, then the question is, is that commercial? And that's sovereign activity for a couple reasons. First, the bank's procedures are modeled after the federal acquisition regulations on purpose. It is, you know, sanctioning parties, regulating the market, and deciding who can participate in government-funded or IDB-funded contracts is a sovereign activity. It follows that pattern. It very- You know, it follows that form very closely. That form is very different from, example, you know, disciplinary proceedings for university professors or professional athletes. Also, the function, the purpose of it is quite different in that, like the U.S. government administering FAR, the IDB through its sanctions proceedings is trying to decide who can protect its funds by deciding who can participate in the market for development contracts. So it is a- It acts as a market regulator, you know, not as, you know, a party simply buying office supplies or engaging in the market in a way that a private party would do. Thank you, Mr. Green. Let me make sure my colleagues don't have additional questions for you. None for me. No. Thank you, Mr. Wren. We'll give you your two minutes that you asked for for rebuttal. Thank you, Your Honor. Maybe let me start with the arguments that were just being made on the commercial activity exception. First of all, the purpose of the Graviman test is to find out whether the case is really tortious conduct occurring abroad. All the activity in this case is taking place in the United States, whatever you want to call it. This is not on a case abroad. So really, it does come down to the test for what is commercial activity. That is the Supreme Court's test. Is it in the power of private citizens in trade and commerce? Because what that tells you is it's not a uniquely governmental function. Mr. Green says that what is really happening here is this body's use of its authority to determine who is able to participate in the market for development contracts, that that's the relevant activity of the IDB. Where is the private analog for that kind of activity? For example, sports leagues. And we put in the record and refer to an article that goes into that. A sports league, as I mentioned before, several different teams, lots of different players, coaches, all through private contractual arrangements. And it can result in a lifetime ban if there's gambling. Isn't the contract relevant to that determination? Isn't the contractual relationship really what is doing the work in allowing the sports league to make those determinations? Yes, it is. And that is also the case with the sanctions procedures here. They have no authority, no jurisdiction. They're a juridical entity. It's a corporation. They only can rely on contracts to impose these things or, as I said before, the boycott power just to decide they're not going to do business with someone. Again, private companies do that and can do that. They talk about sovereign power. They are not a sovereign. And as we pointed out before, the immunities are different and have been tailored by organization. And in this one, they have not been given those privileges and immunities. All right. Let me make sure my colleagues don't have further questions for you, Mr. Wren. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan, Henderson, Jackson